**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**OCALA DIVISION**

**MICHAEL LOREE,**
*individually and on behalf of a class of similarly situated persons,*

*Plaintiff,*

v.

**AANIIIH NAKODA FINANCE, LLC d/b/a BRIGHT LENDING, BORROWWORKS FINANCIAL, INC., BORROWWORKS DECISION SCIENCE, INC., BWDS, LLC, BENJAMIN E. GATZKE, JEFF FORSEY, TAYLOR MCCABE**, *in his individual and official capacity*, and **TRUEACCORD CORP.,**

*Defendants.*

Case Number:

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

COMES NOW the Plaintiff, **Michael Loree** (“**Mr. Loree**”), on behalf of himself and all similarly situated individuals, by and through his attorneys, Seraph Legal, P.A., and complains of the Defendants, **Aaniiih Nakoda Finance, LLC,** *doing business as* **Bright Lending** (“**Bright Lending**” or “**Aaniiih Nakoda Finance**”), **BorrowWorks Financial, Inc.** (“**BorrowWorks**”), **BorrowWorks Decision Science, Inc.** (“**BorrowWorks Decision Science**”), **BWDS, LLC** (“**BWDS**”), **Benjamin E. Gatzke** (“**Gatzke**”), **Jeff Forsey** (“**Forsey**”), and **Taylor McCabe** (“**McCabe**”), in his individual capacity and in his official capacity as CEO of Island Mountain

Development Group, and **TrueAccord Corp.** ("**TrueAccord**") (collectively, the "**Defendants**")**,** stating as follows:

## DESCRIPTION OF THE CASE

1. This is an action brought by Mr. Loree against all Defendants for violations of the *Racketeer Influenced and Corrupt Organization Act*, 18 U.S.C. § 1961, *et seq.* ("RICO"), Florida's *Civil Remedies for Criminal Practices Act,* § 772.101, Fla. Stat., *et seq*. ("CRCPA."), and the *Florida Consumer Collection Practices Act*, § 559.55, Fla. Stat., *et seq.* ("FCCPA"), and against TrueAccord only for violations of the *Fair Debt Collection Practices Act*, 15 U.S.C. § 1692, *et seq.* ("FDCPA").

2. On December 7, 2020, Bright Lending made a short-term, high-interest-rate loan to Mr. Loree through the lending platform BrightLending.com.

3. Bright Lending is an online payday lender offering short-term loans to consumers at annual interest rates which almost always exceed 600% – rates that are illegal in most states, including Florida.

4. Bright Lending claims it's an economic development of, instrumentality of, and a limited liability company wholly-owned and controlled by the Fort Belknap Indian Community of the Fort Belknap Reservation of Montana (the "Tribe"), which is a federally-recognized Native American tribal government.

5. Bright Lending claims its loans are governed by the laws of the Tribe and are therefore governed exclusively by Tribal law and entitled to sovereign immunity.

6. Florida law prohibits usury and caps interest rates at 18% annually. Interest rates that exceed 18% are considered usurious per § 687.071(1), Fla. Stat., and rates that exceed 25% are considered criminally usurious per § 687.071(2), Fla. Stat. Loans made with interest rates that are usurious under Florida Statutes are void *ab initio* under Florida law.

7. Bright Lending's loans, on paper, are supposedly made by Aaniiih Nakoda Finance and subject to the laws of the Tribe. By asserting Tribal ownership, and through the use of choice-of-law and arbitration provisions designed to strip consumers of any remedies they may have under state law, Aaniiih Nakoda Finance, doing business as Bright Lending, sought to avoid state usury laws, such as Florida's. The notion that Bright Lending was operated primarily by, and for the benefit of the Tribe, is a farce.

8. Defendants Forsey and Gatzke are among the non-tribal persons who derive substantial economic benefit from the operation of Bright Lending.

9. BorrowWorks, BorrowWorks Decision Science, and BWDS helped facilitate the loansharking enterprise by providing the technology and software needed to underwrite loans, make decisions on whether to approve or deny a loan application, manage the tens of thousands of active loans, facilitate electronic payment via the Automated Clearing House ("ACH") payment network, and more.

10. BorrowWorks, BorrowWorks Decision Science, and BWDS are paid fees for their services by Bright Lending, and they admit to receiving 49 percent of the

profits of Bright Lending. See *Normajean Weidley et al. vs. Aaniiih Nakoda Finance, LLC, et al.*, Case No. 5:22-cv-095-LCB, N.D. Ala., May 28, 2025.

11. Bright Lending, through its servicers, generally collects its loans itself; however, it assigns certain debts for collection to TrueAccord, a *Debt Collector* as defined by the FDCPA and the FCCPA. TrueAccord then attempts to collect these loans, despite their triple-digit interest rates.

12. TrueAccord serves or has served as a collection agency for a large number of lenders charging usurious interest rates, including Sky Cash USA, Golden Valley Lending, and Minto Money, and is aware of the illegality of these loans in Florida.

## JURISDICTION AND VENUE

13. Subject matter jurisdiction for Plaintiff's federal claims arises under the FDCPA, 15 U.S.C. §1692k(d), RICO, 18 U.S.C. § 1965, and 28 U.S.C. § 1331.

14. This Court has supplemental jurisdiction for Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

15. This Court may also exercise diversity jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(d)(2), as the matter in controversy exceeds $5,000,000 and a member of a class of the plaintiffs is a citizen of a different state from any Defendant.

16. Venue is proper in the Middle District of Florida, pursuant to 28 U.S.C. § 1391(b), because the events giving rise to this cause of action occurred within Florida, including in this District and Division.

## PARTIES

### Mr. Loree

17. **Mr. Loree** is a natural person who at all times relevant has resided in the City of Gainesville, Alachua County, Florida.

18. Mr. Loree is a *Consumer* as defined by the FDCPA and the FCCPA, 15 U.S.C. § 1692a(3) and § 559.55(8), Fla. Stat., respectively.

### McCabe

19. **McCabe** is a defendant in his individual capacity as well as his official capacity as CEO of the Fort Belknap Planning and Development Corporation, d/b/a Island Mountain Development Group ("IMDG"). McCabe resides in Billings, Montana. As CEO, he is responsible for determining policies, goals, strategies and plans concerning IMDG and the corporations it manages, which includes Aaniiih Nakoda Finance, doing business as Bright Lending. McCabe has been CEO of the IMDG and managed the corporations under its umbrella since May 2024.

### Gatzke

20. **Gatzke** is a natural person and the CEO of BorrowWorks, and upon information and belief, resides at 4400 Ledgeview Rd., Fort Worth, TX 76109.

21. As CEO, Gatzke is responsible for, and controls, the management and operations of BorrowWorks, and is therefore personally responsible for the acts, omissions, and violations of BorrowWorks, and shares joint liability with BorrowWorks for its actions.

**Forsey**

22. **Forsey** is a natural person, and upon information and belief, resides at 7468 Prairieside Drive, Fort Worth, TX 76123.

23. Forsey was previously the CEO of ACC Management, which owned 45 different storefront payday lenders.

**BorrowWorks, BorrowWorks Decision Science, and BWDS**

24. **BorrowWorks** is a Texas corporation with a principal business address of 6445 Harris Parkway, Ft. Worth, TX 76132.

25. BorrowWorks' Texas registered agent is Andrew Selking, 6445 Harris Parkway, Ft. Worth, TX 76132.

26. BorrowWorks Decision Science is purportedly dissolved and is the predecessor entity to BWDS.

27. **BorrowWorks Decision Science** is a Delaware corporation and **BWDS** is a Delaware limited liability company, and each have the same principal business address of 6445 Harris Parkway, Ft. Worth, TX 76132.

28. BorrowWorks Decision Science and BWDS also share the same Delaware registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801.

**Aaniiih Nakoda Finance**

29. **Aaniiih Nakoda Finance**, doing business as **Bright Lending**, states it is an entity formed under the laws of the Tribe. It purports to be a subsidiary of Island

Mountain Development Group, also owned by the Tribe, with offices at 353 Old Hays Road, Hays, MT 59527.

**<u>TrueAccord</u>**

30. **TrueAccord** is a Delaware corporation, with a principal business address of 16011 College Blvd., Suite 130, Lenexa, KS 66219.

31. TrueAccord is registered to conduct business in the State of Florida, where its Registered Agent is **Incorp Services, Inc., 3458 Lakeshore Drive, Tallahassee, FL 32312**.

32. TrueAccord is a *Debt Collector* within the meaning of the FCDPA, 15 U.S.C. 1692a(6), and the FCCPA, § 559.55(7), Fla. Stat., in that it uses the internet or another instrumentality of interstate commerce, for its business, the principal purpose of which is the collection of debts, and/or it regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

33. TrueAccord is registered with the Florida Office of Financial Regulation as a *Consumer Collection Agency* ("CCA"), holding license number **CCA9903295.**

34. As a licensed CCA, TrueAccord knows or should know the requirements of both the FDCPA and the FCCPA.

## FACTUAL ALLEGATIONS

### Bright Lending Makes Illegal Loan to Mr. Loree

35. On or around December 7, 2020, Bright Lending made a short-term, $800 loan to Mr. Loree (the "Loan"). **SEE PLAINTIFF'S EXHIBIT A.**

36. Bright Lending charged an annual percentage rate ("APR") of 699.9752%, requiring Mr. Loree to repay a total of $4,342.71 for the $800 loan in under nine months. ***Id.***

37. Mr. Loree repaid a considerable amount to Bright Lending; all of his payments, or almost all of his payments, were applied to the usurious interest of the Loan, with little or none applied to the Loan's principal balance.

38. Mr. Loree used the proceeds from the Loan for consumer goods and services for personal and/or family use.

39. The Loan therefore meets the definitions of *Debt* under the FDCPA and the FCCPA, 15 U.S.C. § 1692a(5) and § 559.55(6), Fla. Stat., respectively.

### The Loan is Subject to Florida Law, Under Which it is Void

40. Mr. Loree took out the Loan from his home in Alachua County, Florida, accessed the BrightLending.com lending platform from his home in Alachua County, Florida, signed all relevant documents from his home in Alachua County, Florida, received correspondence from Bright Lending at his home in Alachua County, Florida, and had money wired into, and out of, his bank account he maintained in Alachua County, Florida, by participants in the Bright Lending enterprise.

41. The final step required of Mr. Loree was to click a box indicating he accepted the terms and conditions presented by Bright Lending.

42. All of, as well as the final, necessary acts to create what Bright Lending purports to be a binding contract, occurred in Alachua County, Florida.

43. "Federal courts applying Florida law have held that under *lex loci contractus,* clicking accept is the last act needed" to confirm similar contracts, and as such, an online contract finalized in Florida is subject to Florida law. *Garn v S. Fla. Stadium LLC*, No. 24-25087-CV, 2025 WL 1279071, at *2 (S.D. Fla. Mar. 26, 2025)

44. Thus, the Loan took place in Florida.

45. Florida has a right to police its borders and to ensure the welfare of its residents. *Manigault v. Springs*, 199 U.S. 473, 480 (1905) ("This power, which in its various ramifications is known as the police power, is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals.")

46. To that end, the State of Florida has long recognized that lending money at usurious interest rates is immoral, harmful, and contrary to public policy.

47. § 687.02(1), Fla. Stat., renders any loan usurious which is made at interest rates greater than 18% per year.

48. § 687.071(2), Fla. Stat., renders loans made with annual interest rates greater than 25% as criminally usurious.

49. § 687.071(3), Fla. Stat., renders loans made with annual interest rates greater than 45% a third-degree felony.

50. § 687.071(7), Fla. Stat., renders any criminally usurious loan void and unenforceable. See also § 516.02(2)(c), Fla. Stat. (rendering debts unenforceable that originated from usurious contracts).

51. Long-standing public policy in Florida confirms the alleged debt is unenforceable. *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935) (criminally usurious loans are "void as against the public policy of the state as established by its Legislature.")

52. Any person who willfully makes a criminally usurious loan, in addition to subjecting themselves to criminal sanctions, forfeits the right to collect payment for the loan. *Id.*

53. When a lender commits criminal usury, even the right to recover principal is prohibited. *Rollins v. Odom*, 519 So. 2d 652, 656 (Fla. Dist. Ct. App. 1988).

54. The purpose of the usury statutes is to protect the needy borrower by penalizing the unconscionable money lender. *Stubblefield v. Dunlap*, 148 Fla. 401, 4 So.2d 519 (1941); *see also Pushee v. Johnson*, 123 Fla. 305, 166 So. 847 (1936); *River Hills, Inc. v. Edwards*, 190 So.2d 415 (Fla. 2d DCA 1966).

55. Florida has taken usury one step further in the consumer loan context through the passing of the Consumer Finance Act, § 516, Fla. Stat. (the "Act").

56. The Act requires licensure and state oversight for lenders issuing loans to Florida consumers in the amount of $25,000 or less, such as the Loan made to Mr. Loree. § 516.02(1), Fla. Stat.

57. The Act further restricts the interest and fees which may be charged by a licensed consumer finance company.

58. § 516.02(c), Fla. Stat., indicates that any loan which fails to comply with the Act is unenforceable in Florida *even if valid wherever made*.

59. Thus, Florida has made clear that in order to enforce a consumer loan against a Florida resident, a lender must be licensed in Florida and comply with the Consumer Finance Act.

60. Mr. Loree's Loan charged an annual interest rate at nearly 700%, more than 23 times the rate permitted by the Act and 28 times Florida's criminal usury rate.

61. Bright Lending is not licensed as a Consumer Finance Company in Florida.

62. Accordingly, the Loan is void and unenforceable in its entirety against Mr. Loree, regardless of whether it was valid under tribal law or wherever else it may have been made.

63. Because the Loan was subject to an annual interest rate greater than 25%, which exceeds the limit as proscribed in § 678.071(2), Fla. Stat., the Loan's balance was void *ab initio* and unenforceable in Florida, pursuant to § 687.071(7), Fla. Stat.

64. Further, because the Loan was subject to interest at more than double Florida's enforceable rate, the Loan constitutes an *Unlawful Debt* as defined by 18 U.S.C. § 1961(6) and § 772.102(2), Fla. Stat.

65. As the Loan was made in violation of § 687, Fla. Stat., the Loan amounts to *Criminal Activity* per § 772.102(1)(a)(11), Fla. Stat.

66. Bright Lending reported the Loan to nationwide Credit Reporting Agencies ("CRAs"), including Clarity Services, Inc ("Clarity"). **SEE PLAINTIFF'S EXHIBIT B.**

**Bright Lending's "Rent-A-Tribe" Scheme**

67. Bright Lending is an online payday lender offering short-term, small-dollar loans to consumers at annual interest rates near or exceeding 600%.

68. According to BrightLending.com, "Aaniiih Nakoda Finance, LLC DBA Bright Lending is an entity formed under the laws of the Fort Belknap Indian Community of the Fort Belknap Reservation of Montana (the 'Tribe'), a federally-recognized and sovereign American Indian Tribe. Bright Lending is wholly-owned by the Tribe. Bright Lending is a licensed lender authorized by the Tribe's Tribal Regulatory Authority." **SEE PLAINTIFF'S EXHIBIT C.**

69. However, such statements are a farce, as the Tribe has no substantive involvement in the operation of Bright Lending.

70. The enterprise was, at all times relevant to this lawsuit, operated for the benefit primarily of non-tribal persons, which includes BorrowWorks, BorrowWorks

Decision Science, BWDS (collectively, the "**Gatzke Entities**"), Gatzke, Forsey, their employees, their contractors, and their investors.

71. The Gatzke Entities and Gatzke do not dispute they contracted with the Tribe to provide services concerning the operation of Bright Lending. *See, e.g.,* Memorandum of Defendants BorrowWorks Decision Science, Inc., BWDS, LLC, and Benjamin E. Gatzke in Support of Motion to Dismiss Second Amended Complaint for Individual and Class Relief, *Normajean Weidley et al. vs. Aaniiih Nakoda Finance, LLC, et al.*, Case No. 5:22-cv-095-LCB, N.D. Ala., August 3, 2023.

72. The Gatzke Entities and Gatzke do not dispute they "assist" Bright Lending with marketing and propose marketing materials. *Id.*

73. Litigation by other consumers has revealed the Gatzke Entities receive 49 percent of the profits of Bright Lending. *Normajean Weidley et al. vs. Aaniiih Nakoda Finance, LLC, et al.*, Case No. 5:22-cv-095-LCB, N.D. Ala., Memorandum Opinion, May 28, 2025.

74. While even a 49 percent cut of profits is sufficient to establish RICO liability, the true percentage pocketed by the Gatzke Entities, Gatzke, and Forsey is likely much higher, since prior to the distribution of profits, Bright Lending must pay certain expenses like technology fees, management/consulting fees, among other fees.

75. Through these fees, a large chunk of the true profits from Bright Lending flow to non-tribal persons before any profit is realized. At that point, what remains is then split 49/51.

76. Although public records are heavily redacted, it is clear that in 2021, the contract between the Tribe and BorrowWorks was changed. ("The contract between the Tribe and BorrowWorks was styled as a (REDACTED) from 2017 until 2021, and as a (REDACTED) from 2021 until the present." Footnote 5, Memorandum of Defendants BorrowWorks Decision Science, Inc., BWDS, LLC, and Benjamin E. Gatzke in Support of Motion to Dismiss Second Amended Complaint for Individual and Class Relief, *Weidley*, *Id.*)

77. Total Management, Inc. was purportedly dissolved in the year 2021.

78. Gatzke was also CEO of Total Management, Inc**.**

79. Total Management, Inc. was a company which was involved in the creation and operation of several lending platforms offering short-term loans at triple-digit interest rates, including Bright Lending, Green Trust Cash, and others.

80. One of the most important assets of any business operating exclusively online is its domain name. To that end, Domain Name Registration records from October 16, 2017, show that BrightLending.com was created by and registered to Ben Gatzke, Total Management, Inc., 1845 Shelby Ln., Fayetteville, AR 72704, domains@borrowworks.com. Records from January 18, 2018, show the same data. **SEE PLAINTIFF'S EXHIBITS D & E.**

81. Trademark records also show BorrowWorks was the original owner of the Bright Lending logo.

82. Thus, entities under the control of Gatzke and Forsey owned key pieces of intellectual property concerning the Bright Lending enterprise from its origination.

83. Gatzke was also the president of BorrowWorks Decision Science, an entity which Gatzke claims was dissolved in 2019. See *Declaration of Benjamin E. Gatzke*, October 3, 2025, ¶ 13, attached hereto as **PLAINTIFF'S EXHIBIT F**.

84. However, BorrowWorks Decision Science appears to have been materially involved in the Bright Lending enterprise well after 2019, and it remains a defendant in a similar consumer complaint alleging violation of Alabama state law and RICO concerning its involvement in the making of usurious Bright Lending loans in 2020 and 2021. See *Normajean Weidley et al. vs. Aaniiih Nakoda Finance, LLC, et al*., Case No. 5:22-cv-095-LCB, N.D. Ala., May 28, 2025.

85. On August 3, 2023, BorrowWorks Decision Science, along with other defendants, filed a motion to dismiss the second amended complaint of a borrower seeking class action status against actors in the Bright Lending enterprise. At no point did BorrowWorks Decision Science assert it was a defunct entity. *Normajean Weidley et al. vs. Aaniiih Nakoda Finance, LLC, et al*., Case No. 5:22-cv-095-LCB, N.D. Ala., August 3, 2023.

86. Bright Lending was not the first "tribally affiliated" lending operation which involved Gatzke and Forsey.

87. Gatzke and Forsey, through OPM Communications or another entity under their control, were also involved in the creation and operation of Green Trust

Cash, a lending platform which ceased operations in mid-2020 and was purportedly operated by the Tribe though the tribally incorporated Green Trust Cash, LLC.

88. Domain Name Registration records from September 13, 2015, show that greentrustcash.com, which like Bright Lending made loans to consumers in Florida, was registered to Jeff Forsey, OPM Communications, 2106 Jenny Lind Rd., Fort Smith, AR 72901, phone: (479) 942-3908, email: jeff@M4us.com. **SEE PLAINTIFF'S EXHIBIT G.**

89. Thus, both Gatzke and Forsey registered and created interactive websites which were online lending platforms which made loans to consumers in Florida at usurious interest rates.

90. The address of OPM Communications, 2106 Jenny Lind Rd., Fort Smith, AR, is the same address as the offices of Total Management and is the address listed by Gatzke in disclosures he reported to the Federal Election Commission concerning contributions he made to the political action committee, Online Lenders Alliance. OPM Communications appears to have never been registered with any Secretary of State as a corporation, trade name, fictitious name, etc.

91. Beginning in 2011 and until recently, Forsey was listed as the Chief Compliance Officer of BorrowWorks. Currently, he is listed on the website of BorrowWorks as being its Senior Vice President of Internal Audit and Operations.

92. As aforementioned, Forsey was previously the CEO of ACC Management, which owned 45 different storefront payday lenders.

93. Forsey and ACC Management have run, or are running, other "rent-a-tribe" schemes with other similar small, impoverished Native American tribes.

94. For example, on September 27, 2022, Corinne Carson ("Carson"), the Comptroller for ACC Management, filed articles of incorporation with the Secretary of State of Oklahoma creating a company called CT2022 Fin 1 LLC.

95. CT2022 Fin 1 LLC is the beneficial owner of Clear Air Lending, an online lender making loans at interest rates exceeding 600% annually and purportedly operated by Robinson Economic Development Corporation ("REDCO"), an economic development arm of the Robinson Rancheria of Pomo Indians of California.

96. Records from the Secretary of State of Oklahoma show the email address corinne@m4us.com was used to register the company; the @m4us.com domain name is identical to the domain used by Forsey when registering the Green Trust Cash domain.

97. On November 8, 2022, CT2022 filed UCC-1 financing statements against Clear Air Lending and REDCO, stating it held a security interest in "any and all net receipts, receivables, net revenues, and rents received by the Debtor from the operation of any business or enterprise or otherwise," "all present and future deposit accounts of the Debtor, including but not limited to the Collateral Deposit Account and the Collection Account, the funds on deposit and all proceeds therefrom, and any and all certificates of deposit," "all property and assets, real or personal, tangible or intangible, now existing or hereafter acquired, of Debtor," and "Eligible Assets," which were

defined as "all consumer loans made pursuant to Consumer Contracts if such Consumer Contracts: (a) comply with the Eligibility Criteria established by Debtor and Lender; and (b) are pledged to lender and in respect of which Lender has a perfected first priority lien not subject to any other liens or claims of any kind."

98. The UCC-1 filing also stated a lien was in effect against "all Intellectual Property of the Debtor," *e.g.*, the Clear Air Lending name and website.

99. Thus, CT2022 Fin 1 LLC has a security interest in all loans made through www.clearairlending.com and the proceeds of such loans.

100. ClearAirLending.com, supposedly owned by the Robinson Rancheria of Pomo Indians of California, operates from a web server with an IP address of 192.0.78.20, which is physically located in San Francisco.

101. BrightLending.com also operates from a web server with the exact same IP address – 192.0.78.20, meaning it is on the same server in San Francisco.

102. The odds that any two websites would, at random, be located on the same server with the same IP address (192.0.78.20) are less than 1:1,000,000,000,000, given that this IP address contains roughly 200 different websites and there are 200 million active websites worldwide. The odds drop to 1:15,600,000,000 if accounting only for websites in the United States, which is roughly 25 million.

103. Additionally, calling the Customer Service number for Bright Lending, 866-441-7674, or the Customer Service number for Clear Air Lending, 855-431-2542, results in an automated response offering the exact same four call routing options in

the exact same order: for balance or upcoming payment information, press 1; for help applying for a loan or application status, press 2; to move your next payment, press 3; for late or returned payment issues, press 4.

104. Bright Lending has a virtual assist named Shimmer, whose coding appears to be custom-written or white label, and not from common third-party platforms like Intercom, Drift, Zendesk, or LivePerson.




105. Clear Air Lending has a very similar virtual assistant named Breeze:




106. Both websites have a self-service feature and utilize the identical subdomains: selfservice.clearairlending.com and selfservice.brightlending.com. Entering either of these addresses redirects to https://idp.clearairlending.com

/auth/realms/clearair/loginactions/authenticate?execution, and idp.brightlending.com/auth/realms/master/ login-actions/authenticate?execution.

107. Both websites use the identical open-source programming for identity authentication, Keycloak.

108. Both websites use the same subdomains for loan applications, apply.clearairlending.com and apply.brightlending.com.

109. In sum, the odds that Clear Air Lending and Bright Lending would have so many similarities – and be located on the same physical web server – and both have direct connections to the Gatzke Entities, Gatzke, and Forsey, despite being purportedly owned by two different Indian tribes, more than 1,000 miles apart, would be astronomically low.

110. Just as working capital, assets, intellectual property, and so forth required to operate ClearAirLending.com were pledged as collateral to a non-tribal entity, on information and belief, Bright Lending is structured in a similar fashion.

111. While Bright Lending claims that Tribal entities provide the working capital to fund consumer loans made under the Bright Lending name, this is simply verbal sleight of hand and obfuscates that the Tribal entities funding the loans draw on revolving lines of credit from non-tribal persons and subjects Bright Lending to significant restrictions in how the lending business is conducted.

112. After the Gatzke Entities receive their 49% profit split and other contractual payments, the Bright Lending profits which remain then flow to Aaniiih

Nakoda Servicing, LLC ("ANS"), a "manager-managed" limited liability corporation formed under tribal law. ANS is then managed by IMDG, which coordinates the Tribe's business planning and development activities. *Weidley*, *Id.* See also *Declaration of Taylor McCabe*, Oct. 2, 2025, attached hereto as **PLAINTIFF'S EXHIBIT H**.

113. Bright Lending is itself owned by GVA Holdings, another "manager-managed" tribal company that is, in turn, "wholly owned by the tribe and managed by" IMDG. *Weidley* and *Declaration of Taylor McCabe*, *Id.*

114. "If this corporate structure leaves you wondering where the Tribe ends and these companies begin, you aren't alone—even (Bright Lending's) corporate representative admits 'there's not a lot of individual definition between' (Bright Lending), ANS, IMDG, and GVA." *Weidley*, *Id.*

115. While the Tribe does "own" Aaniiih Nakoda Finance LLC, the tribal LLC has no employees or assets of its own. *Weidley*, *Id.*

116. In a manner similar to Clear Air Lending, and on information and belief, the revolving lines of credit utilized by Bright Lending to fund loans both contain restrictive covenants which require that only specified "service providers" are used (*e.g.*, BorrowWorks, BWDS, etc.), require the tribes to approve loans only if the borrower was first approved by the software and technology produced by BWDS and/or BorrowWorks, and waive sovereign immunity.

117. The software BWDS and/or BorrowWorks provides may sometimes conditionally approve an applicant pending verification of certain information such as

employment or wages; in some instances, Bright Lending may not be able to verify the required information, resulting in the application being denied "by" Bright Lending. However, this never works in reverse, where an application rejected by the software provided by BWDS and/or BorrowWorks but then is approved by Bright Lending.

**BorrowWorks and BWDS' Role in the Enterprise**

118. BorrowWorks helps lenders "work smarter and more successfully in the highly regulated non-prime market" and "applies 'decision science,' bringing together technology, data sources and innovative thinking to create highly measured guidance that helps lenders to qualify borrowers for personal credit." *BorrowWorks offers lenders a high-tech hand*, Fort Worth Chamber, February 23, 2018, https://www.fortworthchamber.com/chamberupdate/borrowworks-offers-lenders-a-high-tech-hand/.

119. BorrowWorks performs "real-time decision underwriting," "risk strategies that maximize portfolio profitability," "scoring model development and maintenance," and "analytical consulting." *See* borrowworks.com/solutions.

120. BorrowWorks and/or BWDS generate the loan documents and provide Bright Lending with a proprietary loan management system, which provides underwriting technology specifically customized to Bright Lending's loan platform.

121. BWDS' software seeks to predict the repayment abilities of consumers who apply for online payday loans with exceedingly high interest rates, as well as the propensities of the consumer to actually repay the loans.

122. BWDS is paid a substantial fee per application analyzed.

123. Software designed and developed by BWDS was utilized in the underwriting of Mr. Loree's Loan.

124. BWDS' software is written specifically to cater to the needs of lenders like Bright Lending, *e.g.*, lenders which charge interest rates of 600% or more.

125. BWDS also developed the smartphone app consumers can use to apply for a loan, manage their loan, make payments on their loan, and more. The Apple App Store shows that BWDS is the listed developer of the Bright Lending mobile app.




126. The Apple App Store states the app is "copyright © 2022 BWDS LLC" and that it is sold by BWDS, LLC.

127. The Apple App Store states contact information, identifiers, usage data, and user content may be collected and linked to the consumer's identity by the app and provided to the developer, BWDS, LLC.

128. The Bright Lending app owned and developed by BWDS, LLC is advertised to, and available for download to, consumers throughout the country, including those in Florida.

129. At all times, BWDS was aware its software was used by Bright Lending, written for consumers (*e.g.*, the smartphone app), and used in the furtherance of making and collecting loans with interest rates often exceeding 600% annually, including loans made to consumers in Florida.

130. Gatzke, the CEO of BWDS and BorrowWorks, authorized the creation, marketing and sale of the Bright Lending app to consumers.

131. The provision of software to entities a person knows will use the software to facilitate illegal activities, or reasonably should know, is sufficient to create liability when the software constitutes substantial assistance to the enterprise.

132. For example, in 2021, the software provider Credit Repair Cloud was sued by the Consumer Financial Protection Bureau ("CFPB"); the CFPB alleged Credit Repair Cloud reasonably knew its users would use the software to violate the federal Credit Repair Organizations Act, 15 U.S.C. §§ 1679–1679j by collecting unlawful, upfront payments from consumers. *Consumer Financial Protection Bureau v. Daniel A. Rosen, Inc. et al.*, No. 2:21-cv-07492 (C.D. Cal. 2024). The matter was settled in 2024 with the defendants agreeing to pay $3 million in civil penalties and to modify their business practices.

133. While BorrowWorks and BWDS provide software and technology, their involvement in the operation of Bright Lending's loan platform is far more intricate and involved than the mere licensing of software.

134. As the 49 percent profit split and other fees extracted from the Bright Lending enterprise indicate, along with key intellectual property and software being owned by entities controlled by Gatzke and Forsey, the Gatzke Entities, Gatzke, and Forsey are not mere helpers or assistants but primary architects of the lending scheme.

135. The Gatzke Entities and their contractors and hired agents are meaningfully involved in many aspects of Bright Lending, including underwriting decisioning, collection strategies, credit reporting, the hiring of third-party debt collectors to collect unpaid balances, and more.

136. Subscriber accounts in the name of Bright Lending have been issued by at least two nationwide specialty consumer credit reporting agencies, DataX, Ltd. ("DataX"), a subsidiary of Equifax, and Clarity, a subsidiary of Experian.

137. Both DataX and Clarity have extensive policies in place to conduct due diligence on potential new customers, and periodically require recertification or recredentialling of its subscribers, in which it verifies and updates information in its files on a subscriber. Both credit bureaus require each subscriber to list the names, addresses, and email addresses of key contacts – usually, at least five.

138. On information and belief, many of the key contacts for the Bright Lending subscriber accounts are non-tribal individuals.

139. When an application for a loan with Bright Lending is submitted, software developed by the Gatzke Entities automatically obtains data relating to the borrower from one or more credit reporting agency, evaluates the data pursuant to

preset criteria, and then returns a suggested outcome for the application, such as "approve" or "deny." On information and belief, the software can also return a conditional approval which requires manual verification of certain data points, such as employment or wages.

140. While the Tribe and the Gatzke Entities have asserted IMDG provides the day-to-day management of Bright Lending, these statements gloss over the fact that the lion's share of what constitutes as "management" of a lending enterprise like Bright Lending is determining who to lend to, how much, and on what terms – all factors controlled by the Gatzke Entities, Gatzke, and Forsey.

141. Mr. Loree's loan approval was transmitted to an employee of Aaniiih Nakoda Finance, who may have been located on the Tribe's land, who then rubber-stamped an approval, thus creating, in name only, approval "on" the Tribe's land.

142. After the Loan was made, the Gatzke Entities reported loan payment history and other information about Mr. Loree to Clarity on behalf of Bright Lending. **SEE PLAINTIFF'S EXHIBIT B.**

143. The Tribe and the Gatzke Entities do not dispute the Tribe "lacked the expertise to implement the business on its own." Gatzke holds a Master of Business Administration (MBA) degree from Baylor University and worked for Think Finance, which was previously one of the largest entities making loans under a "tribal partnership" model, and has operated BorrowWorks since 2011. In contrast, McCabe, the current CEO of IMDG, states on his online resume on LinkedIn that he worked

in construction management, payroll, operations management and as director of health and safety. He appears to have had little experience in consumer lending prior to taking over as CEO and has a degree from the University of Phoenix, an online university.

144. The only meaningful contribution the Tribe makes is that non-tribal persons can profit immensely from the making of loans at 700% interest rates and can claim Tribal law allows Bright Lending to do so – law which, not coincidentally, was amended in the early 2010s to allow for loans to be made at triple-digit interest rates. The Tribe's provision of the appearance of sovereign immunity is its main contribution.

145. The Gatzke Entities, directly or via contractors, also made multiple collection communications to Mr. Loree, via e-mail, telephone, or text message, including communications made within the last four years.

146. Even assuming, *arguendo*, that the role of the Gatzke Entities was limited to loan servicing and underwriting, the Gatzke Entities are still subject to the provisions of Florida's Consumer Finance Act, as "each person who in any manner participates therein in this state is subject to this chapter," which would include servicers and underwriters of loans. § 516.02(c), Fla. Stat.

**The Tribe Engages in Myriad Rent-A-Tribe Schemes**

147. The purported beneficial owner of Bright Lending, the Tribe, is a small, economically depressed, isolated tribe in rural Montana.

148. Despite having few enrolled members, the Tribe operates, or has operated, more than two dozen online payday loan websites, each under a different tribal company's name which is "rented" to a different non-tribal beneficial owner.

149. The Tribe previously had a "rent-a-tribe" scheme active with William C. "Cheney" Pruett, a Texas businessman who owns several dozen storefront payday lenders and contracted with the Fort Belknap Tribe to claim ownership of his website, Riverbend Cash (www.riverbendcash.com).

150. The Tribe previously had a "rent-a-tribe" scheme active with Vivus Servicing LTD concerning North Cash (northcashlending.com). Vivus is wholly owned by 4finance, a large, worldwide payday loan conglomerate based in Riga, Latvia.

151. The Tribe also previously had a "rent-a-tribe" scheme active with Soaren Management and others, an Arizona-based company, concerning Target Cash Now (targetcashnow.com).

152. Moreover, the Tribe also had a "rent-a-tribe" scheme active with Paul Anthony Pellizzon, a multi-millionaire California developer and one of his companies, Center Ice Servicing, which had offices in Texas, concerning a lending website called The Cash Fairy.

153. All of these lending platforms are now defunct, in most cases as the result of class action lawsuits seeking millions of dollars in damages, alleging each website was a "rent-a-tribe" scheme.

**The Gatzke Entities are the "True Lender" of Plaintiff's Loan**

154. As aforementioned, the Gatzke Entities receive 49% of the profits of each loan. However, when considering other fees they are paid, the true split is far more than 50% in favor of the Gatzke Entities.

155. Gatzke, on behalf of BorrowWorks, BorrowWorks Decision Science, and BWDS, participated in the decisions on how to structure Bright Lending, which loan documents to use, which states to lend into, what interest rates to charge, how to capitalize the lending operations, how to market into each state, how to divide the profits of the enterprise, how to mechanically deliver loan proceeds and collect payments, provide for the loans, collect the payments as well as decisions as to the size of the loans, interest rates and the decision not to obtain licensing required by Florida law.

156. The various fees must be repaid to the Gatzke Entities prior to any surplus being retained by the Tribe, meaning that the non-tribal economic interests come *before* those of the Tribe's.

157. In the event a particular loan is charged off as uncollectable prior to at least the original principal loan amount being paid, the Gatzke Entities stand to lose far more than IMDG or the Tribe.

158. The Gatzke Entities provide the infrastructure to operate Bright Lending and are integral to the lending business' existence.

159. Thus, the Gatzke Entities – and not the Fort Belknap Tribe – are the true lenders of Mr. Loree's Loan, because the Gatzke Entities have the predominant economic interest in loans made to consumers like Mr. Loree by Bright Lending. *See Fulford v. Marlette Funding, LLC,* No. 17CV30376 and *Fulford v. Avant of Colorado, LLC*, No. 17CV30377 (Colo. Dist. Ct. Denver County Aug. 13, 2018).

160. Since nearly all meaningful activity concerning the payday loans made by Bright Lending do not occur on an Indian reservation, regardless of whether certain administrative aspects are addressed on the Fort Belknap Tribe's land, the loans were not made "on" the reservation.

161. A significant majority of the transactions occur within the State of Florida – from completing the application to receiving the funds.

162. Mr. Loree, like most customers of Bright Lending, acquired his Loan without leaving his home. The Loan proceeds were deposited into his bank account in Florida, and withdrawals and attempted withdrawals were made from the same account. Collection communications, including emails and text messages, were sent to his in Florida.

163. Federal appellate courts have held that where a consumer is located when he or he submits an application via an online portal with a Native American tribe determines where the transaction takes place for jurisdictional purposes. *California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 968 (9th Cir. 2018) ("However, the patrons' act of placing a bet or wager on a game of DRB while located in California constitutes

gaming activity that is not located on Indian lands, violates the UIGEA, and is not protected by IGRA.")

164. Mr. Loree has never set foot on Fort Belknap Tribal land in Montana.

165. BorrowWorks, BorrowWorks Decision Science, BWDS, Gatzke, and Forsey, vis-à-vis Aaniiih Nakoda Finance, operate an interactive website, BrightLending.com, that is easily accessible to Florida residents, made loans to Florida residents, and regularly wires funds to consumers in Florida and to Florida banks.

166. Bright Lending has a considerable number of customers in Florida, and it advertises and markets its loans to Florida consumers, including Plaintiff.

167. BorrowWorks, BorrowWorks Decision Science, and BWDS, directly or through agents, or through software it developed, sends many communications via text message and e-mail to consumers in Florida, including more than a dozen collection emails to Mr. Loree.

168. At all times relevant, all of the Defendants sought to serve the Florida market, as did Bright Lending.

169. McCabe, named as a defendant individually and in his official capacity as CEO of IMDG, has the ability to order Bright Lending to stop making loans to consumers in Florida, and/or all other states which prohibit short term loans being made at 700% interest rates.

170. McCabe is aware of the nature of the loans made by Bright Lending, as delineated in *Declaration of Taylor McCabe in Support of Motion to Dismiss* filed October 2, 2025.

171. McCabe stated that the IMDG Board of Directors and CEO "serve as the de facto Board of Directors and CEO for Bright Lending." *Id.*

172. Persons associated with the Bright Lending enterprise have made collection communications to Mr. Loree in the last four years, as well as in the last two years.

173. McCabe intentionally committed a tort in Florida against Mr. Loree when he oversaw Bright Lending and allowed collection communications to be sent to Mr. Loree demanding payment of a usurious debt.

174. McCabe was fully aware of the nature of the lending business Bright Lending engaged in, including the amounts retained by the Tribe and the amounts paid to non-tribal persons.

**<u>TrueAccord Collects Unlawful Debt</u>**

175. Despite making $417 of payments by February 2021, Bright Lending claimed Mr. Loree still owed it another $1,469.

176. Around June 2021, one or more persons associated with the Bright Lending enterprise placed the alleged $1,469 balance for collection with TrueAccord and instructed it to collect this balance from him (the "Debt").

177. TrueAccord then began sending Mr. Loree collection communications by e-mail and other methods.

178. At no point did TrueAccord disclose that the Bright Lending loan was null, void, and unenforceable against Mr. Loree under Florida law.

179. To the contrary, TrueAccord claimed the loan was valid and enforceable against him and that the alleged $1,469 debt was *legally owed*.

180. Specifically because of these representations, Mr. Loree made a series of 13 payments of $81.59, or $1060.67 total, between June 2021 and June 2022.

181. TrueAccord retained between 40% to 50% of this money as its fee or commission and remitted the rest to one or more persons involved in the Bright Lending enterprise.

182. TrueAccord continued its collection correspondence with Mr. Loree after he made the payments.

183. At no point in any of its correspondence, nor anywhere on TrueAccord's website, did TrueAccord disclose that Florida law prevents Mr. Loree from being sued for the Debt, as the underlying loan was void.

184. Upon receiving collection communications from TrueAccord, Mr. Loree believed that the purported Debt was legally enforceable against him, and that TrueAccord would report the account as a collection tradeline to the major credit bureaus, *e.g.,* Equifax, Experian and Trans Union.

185. The failure to disclose that a debt from a loan shark like Bright Lending is not legally owed under Florida law materially disadvantages a consumer.

186. Further, the attempted collection of any debt which was void *ab initio* and not actually owed is a *per se* violation of the FDCPA's prohibitions against the use of false and misleading collection tactics.

187. TrueAccord has created a niche for itself as one of the few large, nationwide debt collection agencies willing to collect debts for lenders who engage in dubious "tribal" and "bank partnership" lending models.

188. Clients of TrueAccord have included Sky Trail Cash, a "tribal" lender beneficially operated and owned by Texas payday titan William C. Pruett and his related companies, Sky Trail Servicing and DMP Investments. Sky Trail Cash made short-term loans at 700% and higher interest rates, until a recent multi-million-dollar class action lawsuit resulted in the website discontinuing operation.

189. TrueAccord also collects for OppLoans, a Chicago-based lender which makes short-term loans to consumers at interest rates averaging 155% annually.

190. TrueAccord also collects for Plaza Services of Atlanta, LLC, a debt buyer who purchases charged-off debt from myriad sources who make consumer loans at 200% interest rates and higher.

191. TrueAccord has had state regulatory action taken against it for collecting unlawful debts.

192. TrueAccord was charged with violating the Colorado Fair Debt Collections Act by the Colorado Attorney General for collecting short-term loans with interest rates ranging from 500% to 900% APR, which exceeded the state's interest rate cap of 12% for unlicensed loans. TrueAccord agreed to pay $500,000 in restitution and to stop collecting loans which violate the 12% usury cap.

193. TrueAccord entered into an Assurance of Voluntary Compliance with the Pennsylvania Attorney General. The Office of Attorney General alleged TrueAccord collected on online payday loans made by lenders claiming to be affiliated with Native American tribes, and TrueAccord misrepresented the legal status of the alleged debts in violation of Pennsylvania's Fair Credit Extension Uniformity Act. TrueAccord agreed to pay more than $23,000 in restitution plus civil penalties and costs. TrueAccord also agreed to cease collection of "tribal" loans and voluntarily stopped collecting these loans in Pennsylvania as of June 2022.

194. In June 2022, TrueAccord entered into a Consent Order with the Connecticut Department of Banking and issued refunds totaling approximately $44,000 to Connecticut consumers. TrueAccord was ordered to cease and desist from collecting on small loans not made in compliance with state law, including those from unlicensed tribal lenders.

195. Beyond this, TrueAccord has been subject to scores of private causes of action from consumers alleging it violated state and federal racketeering statutes

concerning the collection of ultra-high-interest loans, including a significant number from Florida consumers concerning Bright Lending.

196. Despite this, as of December 2025, TrueAccord continued to make collection communications directed to Mr. Loree, claiming he still owed $407 on the $800 loan from 2020 which he had already repaid well over $1,500 on by mid-2022.

197. TrueAccord's communications falsely claimed a null, void, and usurious debt is legally-owed when TrueAccord knew the alleged balance was an unlawful debt and not enforceable against Mr. Loree.

198. TrueAccord's website and emails to Mr. Loree were *Communications* as defined by the FDCPA, 15 U.S.C. § 1692a(2), and the FCCPA, § 559.55(2), Fla. Stat., and were in connection with the collection of the Debt.

**Defendants' Scheme Constitutes an Enterprise under RICO**

199. RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

200. In *Boyle v. United States*, the Supreme Court recognized that RICO's definition of enterprise was "obviously broad" and included an "association in fact" enterprise. 556 U.S. 938, 944 (2009).

201. Thus, an enterprise may be a legally recognized entity like a corporation or an "association in fact enterprise," i.e., "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452

U.S. 576, 583 (1981); *Boyle*, 556 U.S. at 948 ("[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose.").

202. Defendants are an association in fact enterprise who are associated together for the common purpose of making, collecting, and profiting off illegal loans.

203. Courts throughout the nation have held that even the provision of ordinary and legal services (*e.g.*, the provision of data analytics, underwriting analysis, credit reports, etc.) can create liability under RICO if the actors are aware of the greater scheme afoot. *See, e.g. Smith v. Berg*, 247 F. 3d 532, 537 (3d Cir. 2001) (relying on *Salinas v. United States*, 522 U.S. 52 (1997) (holding that a court may not dismiss a RICO claim against an alleged conspirator simply because the defendant characterizes itself as having merely provided ordinary services, if there are plausible allegations that those services were provided with an awareness of the broader scheme being furthered).

204. A plaintiff "can establish a RICO conspiracy claim by showing a [d]efendant: (1) agreed to the overall objective of the conspiracy; or (2) agreed to commit two predicate acts." *In re Takata Airbag Prods. Liab.*, 396 F. Supp. 3d 1101, 1164 (S.D. Fla. 2019).

205. Here, the enterprise works as such:

a. Leads are purchased from various online lead generators, who operate various "referral" websites, usually targeted to consumers who Google "quick loan, bad credit" or similar. These lead generators then harvest the

personally identifying information of consumers like Mr. Loree and sell this data to lenders such as Bright Lending. Plaintiff does not know which lead generator harvested and sold his data to Bright Lending, but should the lead generator be identified, Plaintiff will seek to amend his complaint to include them. The lead generator would be well aware of the greater scheme afoot since it is generating leads of particular interest to Bright Lending and similar online lending platforms.

b. Credit reporting agencies like Clarity provide detailed consumer credit reports geared specifically toward the needs of online payday lenders like Bright Lending. Clarity conducted significant due diligence on Bright Lending and obtained sample loan contracts which included interest rates charged.

c. Data analytics entities like BorrowWorks and BWDS analyze data obtained from the lead generator and credit reporting agency, as well as other information, such as the consumer's bank account. BorrowWorks and BWDS are well aware of the goals of the enterprise as they perform data analytics on prospective borrowers and are thus aware of the triple-digit interest rates charged. It would be impossible for BorrowWorks and BWDS to analyze consumer data and make an underwriting recommendation without knowing the repayment amounts required of the consumer.

BorrowWorks and BWDS thus contributes services it knows will help to continue and perpetuate the Bright Lending enterprise and does so for profit.

d. BorrowWorks, BWDS, Gatzke, and Forsey help to oversee and manage the enterprise and have helped collect funds on behalf of the enterprise.

e. Access to the ACH payment network is tightly restricted and regulated. The ability for online payday lenders like Bright Lending to gain access to the ACH network to process payments became much tougher after the DOJ initiated Operation Choke Point. While traditional, legal businesses pay a few cents or less per ACH transaction, online lenders like Bright Lending have to resort to the services of payment processors willing to "look the other way" about the transactions they are processing and often pay fees amounting to 3% to 6% of the transaction. An ACH processor would be aware of the loansharking enterprise and would have agreed to help facilitate it. Should the ACH processor be identified, Plaintiff will seek to amend his complaint to include them.

f. The funding of consumer loans requires access to tens of millions of dollars of working capital. Hedge funds, private equity firms, or similar likely provide these revolving lines of credit to the Bright Lending enterprise. The hedge funds, private equity firms, and other investors find these investments attractive since they can receive 20% to 22% interest on the credit lines – far higher rates of return than corporate bonds. Moreover, lending enterprises

like Bright Lending are often incredibly profitable and financially stable, whereas a traditional company with a CCC-credit rating is the polar opposite. Thus, the hedge funds get outsized returns without much risk of default by the borrower. The caveat, of course, is that the lender is making loans to consumers nearly 700% interest rates, activity which is criminal in many states. Plaintiff does not know which hedge fund(s), private equity group(s), or other outside investor(s) provide the revolving lines of credit. Once identified, Plaintiff will seek to amend his complaint.

g. A very small number of tribal members do see some personal economic benefit from the Bright Lending loan platform, including McCabe. They receive payment to assert Bright Lending is owned by a tribal member. These tribal members are paid to create the appearance of foreign, tribal ownership, which dissuades consumers from bringing suit.

h. Third-party collection agencies like TrueAccord collect unpaid balances concerning Bright Lending. These collection agencies are provided with the original loan documents and are aware of the interest rates charged, but elect to collect the debts anyway, asserting they are legitimate when they know they are not. The third-party debt collectors receive 40% to 50% of funds recovered from consumers as a commission. Much of the money recovered stems from usurious interest.

206. Here, BorrowWorks, BorrowWorks Decision Science, BWDS, Gatzke, Forsey, and TrueAccord, along with Bright Lending and the Fort Belknap Tribe, collaborated together for the common purpose of making, collecting, and profiting off illegal loans.

207. As of the date of this filing, persons associated with the Bright Lending enterprise continue to assert $407.83 is owed by Mr. Loree to Bright Lending.

208. Mr. Loree has hired the aforementioned law firm to represent him in this matter and has assigned his right to fees and costs to such firm.

## CLASS ACTION ALLEGATIONS

209. Pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3) and/or (b)(4), Plaintiff brings this action for himself and on behalf of the following classes of which he is a member, initially defined as:

**The "Florida Loan Class":**

All natural persons within the State of Florida who obtained a loan from Bright Lending within the past five (5) years preceding the filing of this Complaint, wherein the annual percentage rate (APR) of interest on said loan exceeded 25 percent (25%).

**The "TrueAccord FCCPA Class":**

All natural persons within the State of Florida who received collection communications from TrueAccord regarding any alleged Bright Lending debt being owed, in the past two (2) years preceding the filing of this Complaint, in which the communication failed to disclose the balance was not legally enforceable.

**The "TrueAccord CRCPA Class":**

All natural persons within the State of Florida who obtained a loan from Bright Lending wherein the annual percentage rate (APR) of interest on said loan exceeded five-hundred percent (500%) and received collection communications from TrueAccord which failed to state that such debt was unenforceable or which resulted in the person making at least one payment in the past four (5) years preceding the filing of this Complaint,.

**The "TrueAccord RICO Class":**

All natural persons within the United States of America who obtained a loan from Bright Lending wherein the annual percentage rate (APR) of interest on said loan exceeded five-hundred percent (500%) and received collection communications from TrueAccord which failed to state that such debt was unenforceable or which resulted in the person making at least one payment in the past four (4) years preceding the filing of this Complaint.

**The "TrueAccord FDCPA Class":**

All natural persons within the United States of America who received collection communications from TrueAccord regarding any alleged Bright Lending debt being owed, in the past one (1) year preceding the filing of this Complaint, in which the communication failed to disclose the balance was not legally enforceable.

**The "National Loan Class" (together with the Florida Loan Class, TrueAccord FCCPA Class, TrueAccord CRCPA Class, TrueAccord RICO Class, and the TrueAccord FDCPA Class, the "Classes")[1]:**

All natural persons within the United States of America who obtained a loan from Bright Lending wherein the annual percentage rate (APR) of interest on said loan exceeded five-hundred percent (500%) and received collection communications from Bright Lending which resulted in the person making at least one payment in the past four (4) years preceding the filing of this Complaint.

[1] Plaintiff reserves the right to amend the definition of the Classes based on subsequent discovery or legal developments.

210. Excluded from the Classes are the Defendants and any of their officers, directors, and employees.

211. Plaintiff reserves the right to modify or amend the class definitions before the Court determines whether certification is appropriate.

212. **Numerosity. Fed R. Civ. P. 23(a)(1).** The Class members are so numerous that joinder of all of them is impractical. Bright Lending is heavily marketed online and accessible to consumers throughout Florida and each state in the country. Although the precise number of members in each class is unknown, on information and belief, there are at least 10,000 members of the National Loan Class, and 1,000 members each of the Florida Loan Class, the TrueAccord RICO Class, the TrueAccord CRCPA Class, the TrueAccord FDCPA Class, and the TrueAccord FCCPA Class and the names and addresses of these persons are identifiable through documents and business records maintained by the Defendants. Thus, the class is so numerous that joinder of all members is impracticable. The class members may be notified of the pendency of this action by published or mailed notice.

213. **Existence and Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** There are questions of law and fact that are common to the Classes which predominate over questions affecting any individual class member. Specifically, these common questions include, without limitation: (a) whether the Defendants and associated persons constitute an *Enterprise* as defined by RICO and the CRCPA; (b) whether loans made to members of the Classes by Bright Lending

amount to *Unlawful Debts* as defined by RICO and the CRCPA; (c) whether the Defendants participated in the enterprise through the collection of unlawful debt; (d) whether the Defendants participated in the enterprise through a pattern of criminal activity; (e) whether the Defendants conspired to collect unlawful debts; (f) whether TrueAccord's collection of Bright Lending balances violated the FCCPA and/or the FDCPA; and (g) whether Plaintiff and the members of the Classes were harmed by the Defendants.

214. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each Class member, which all arise from similar operative facts and are based upon the same legal theories. Bright Lending made numerous loans to consumers throughout the United States, including Florida, charging interest in excess of state interest rate caps and without any state lending licenses. Plaintiff has no interest adverse or antagonistic to the interests of other members of the Classes and has the same claims for statutory damages that he seeks for members of the Classes.

215. **Adequacy of Class Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the Classes and will fairly and properly protect the interests of the Classes. Plaintiff has retained experienced counsel who have litigated well over 2,000 consumer cases under consumer protection statutes, including RICO, the FDCPA, and the CRCPA. Plaintiff's counsel is competent in the prosecution of class action litigation and intend to prosecute this action vigorously. Plaintiff and his counsel will fairly and adequately protect the interests of members of the Classes.

216. **Predominance and Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the Class members predominate over questions affecting only individual Class members. Under the totality of the circumstances, a Class Action is superior to other available methods for the fair and efficient adjudication of the controversy. The Defendants' conduct described in this Complaint stems from common and uniform practices, resulting in systematic violations of RICO, the CRCPA, the FCCPA, and with respect to TrueAccord, the FDCPA. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the Classes individually to effectively redress the wrongs done to them. Even if the members of the Classes themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by the Defendants' conduct.

## COUNT I
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
## National Loan Class and TrueAccord RICO Class

217. Plaintiff adopts and incorporates paragraphs 1 - 208 as if fully set forth at length herein.

218. Defendants are corporate entities and persons as defined by 18 U.S.C. § 1961(3) and within the meaning of 18 U.S.C. § 1962(c).

219. 18 U.S.C. § 1961(6) defines an "unlawful debt" as any debt which is unenforceable under State or Federal law in whole or in part as to the principal or interest, because of the laws relating to usury and was incurred in connection with the business of lending money at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.

220. 18 U.S.C. § 1962(a) includes as prohibited activity any person who receives income derived directly or indirectly from a pattern of racketeering activity, or through collection of an unlawful debt.

221. 18 U.S.C. § 1962(c) prohibits any person associated with any enterprise from conducting, participating directly or indirectly, in the conduct of the enterprise's affairs through collection of unlawful debt.

222. As alleged above, the Defendants are a group of individuals associated in fact, although they are not a single legal entity. Together, the Defendants worked toward a common goal of furthering the Bright Lending racketeering scheme and receiving profit therefrom.

223. The loans issued through Bright Lending to Mr. Loree and the Classes carried an interest rate more than double that of applicable state law and, thus, the loans are unenforceable and constitute *Unlawful Debts* under RICO, 18 U.S.C. § 1961(6).

224. The Defendants each associated with the enterprise and participated in the affairs of the enterprise as described in detail herein, which existed for the purpose of collecting unlawful debt.

225. The Defendants' participation in the enterprise violated § 1962(c) of RICO and caused Mr. Loree and the Classes to repay amounts on unlawful loans.

226. Bright Lending operated across state lines, making loans to consumers throughout the United States. As such, the Defendants' conduct involved interstate commerce.

**WHEREFORE,** Plaintiff and the putative class members pray for relief as follows:

a. Certification for this matter to proceed as a class action;

b. Treble all amounts paid by Plaintiff and the putative class members towards their Bright Lending Loans, pursuant to 18 U.S.C. § 1964(c);

c. Reasonable attorneys' fees and costs;

d. An order voiding any remaining Bright Lending loans made to Plaintiff and the Classes; and,

e. Such other and further relief the Court may deem just and proper.

**COUNT II**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)**
**National Loan Class and TrueAccord RICO Class**

227. Plaintiff adopts and incorporates paragraphs 1 - 208 as if fully set forth at length herein.

228. As alleged above, the Defendants are a group of individuals associated in fact, although they are not a single legal entity. Together, the Defendants worked toward a common goal of furthering the Bright Lending racketeering scheme and receiving profit therefrom.

229. The loans issued through Bright Lending to Mr. Loree and the Classes carried an interest rate more than double that of applicable state law and, thus, the loans constitute *Unlawful Debt* under RICO, 18 U.S.C. § 1961(6).

230. The Defendants violated § 1962(d) of RICO by conspiring with each other, and other persons, to issue and/or collect unlawful debts through Bright Lending.

231. The Defendants each took actions in furtherance of this conspiracy. For example, at various times, the Defendants have: (a) issued a loan to Plaintiff and the Class members; (b) requested and obtained consumer credit reports regarding potential borrowers; (c) initiated ACH deposits and withdrawals to the Class members' bank accounts; (d) claimed ownership of Bright Lending to provide a guise of tribal; attempted to collect usurious loan balances from Plaintiff and the Class members; and/or, (f) received payment on void and unenforceable loan balances from Plaintiff and the Class members.

232. The Defendants also each knew the ultimate goal of the enterprise – to make and collect loans charging well in excess of 25% APR.

**WHEREFORE**, Plaintiff and the putative class members pray for relief as follows:

a. Certification for this matter to proceed as a class action;

b. Treble all amounts paid by Plaintiff and the putative class members towards their Bright Lending Loans, pursuant to 18 U.S.C. § 1964(c);

c. Reasonable attorneys' fees and costs;

d. An order voiding any remaining Bright Lending loans made to Plaintiff or Plaintiff and the Classes; and,

e. Such other and further relief the Court may deem just and proper.

**COUNT III**
**VIOLATIONS OF THE CRCPA, § 772.103(3), FLA. STAT.**
**Florida Loan Class and TrueAccord CRCPA Class**

233. Plaintiff adopts and incorporates paragraphs 1 - 208 as if fully set forth at length herein.

234. Bright Lending's loans each charged interest in violation of Chapter 687, Fla. Stat.

235. Violations of § 687 amount to *Criminal Activity* as defined by § 772.102(1)(11), Fla. Stat.

236. As alleged above, the Defendants are a group of individuals associated in fact, although they are not a single legal entity. Together, the Defendants worked toward a common goal of furthering the Bright Lending racketeering scheme.

237. The loans issued by Bright Lending to Mr. Loree and the Classes carried an interest rate far in excess of the permissible rate under Florida law and, thus, the loans are unenforceable and constitute *Unlawful Debts* under the CRCPA, § 772.102(2), Fla. Stat.

238. The Defendants each associated with the enterprise and participated in the affairs of the enterprise as described in detail herein, which existed for the purpose of collecting unlawful debt.

239. The Defendants violated § 772.103(3), Fla. Stat., when they each participated in the enterprise, which enterprise conducted a pattern of criminal activity. At various times, the Defendants: (a) issued a loan to Plaintiff and the Class members; (b) requested and obtained consumer credit reports regarding potential borrowers; (c) initiated ACH deposits and withdrawals to the Class members' bank accounts; (d) claimed ownership of Bright Lending to provide a guise of tribal ownership; (e) attempted to collect usurious loan balances from Plaintiff and the Class members; and/or, (f) received payment on void and unenforceable loan balances from Plaintiff and the Class members.

**WHEREFORE,** Plaintiff and the putative class members pray for relief as follows:

a. Certification for this matter to proceed as a class action;

b. Treble all amounts paid by Plaintiff and the putative class members towards their Bright Lending Loans, pursuant to § 772.104, Fla. Stat.

c. Reasonable attorneys' fees and costs;

d. An order voiding any remaining Bright Lending loans made to Plaintiff and the Classes; and,

e. Such other and further relief the Court may deem just and proper.

**COUNT IV**
**VIOLATIONS OF THE CRCPA, § 772.103(4), FLA. STAT.**
**Florida Loan Class and TrueAccord CRCPA Class**

240. Plaintiff repeats and realleges paragraphs 1 - 208 as if fully set forth at length herein.

241. Bright Lending's loans each charged interest in violation of § 687, Fla. Stat.

242. Violations of § 687 amount to *Criminal Activity* as defined by § 772.102(1)(11), Fla. Stat.

243. The intent of Bright Lending and its related entities is clear in that they knowingly engaged in a pattern whereby they made loans well in excess of 45% interest per annum, in violation of Section 687.071(3), Florida Statutes, and then proceeded to collect these unlawful debts and obtain proceeds therefrom, all while operating under a scheme pursuant to which they claimed tribal sovereign immunity so as to attempt to avoid liability under Florida's usury statutes.

244. The intent of TrueAccord is clear in that it knowingly engaged in a pattern whereby it collected, and continues to collect, unlawful debt for dozens of online loan sharks, including Bright Lending, who make loans to consumers well in

excess of 45% interest per annum, in violation of Section 687.071(3), Florida Statutes, all while claiming such loans are lawful and legitimate, when it knows this not to be true.

245. As alleged above, the Defendants are a group of individuals associated in fact, although they are not a single legal entity. Together, the Defendants worked toward a common goal of furthering the Bright Lending racketeering scheme.

246. The Defendants violated § 772.103(4), Fla. Stat. by conspiring with each other, and other persons, including the Fort Belknap Tribe, to issue and/or collect unlawful debts through Bright Lending.

247. The Defendants agreed to participate in the conspiracy and agreed to the overall objective of the conspiracy – to collect unlawful loans.

248. The Defendants each took actions in furtherance of this conspiracy. At various times, the Defendants: (a) issued a loan to Plaintiff and the Class members; (b) requested and obtained consumer credit reports regarding potential borrowers; (c) initiated ACH deposits and withdrawals to the Class members' bank accounts; (d) claimed ownership of Bright Lending to provide a guise of tribal ownership; (e) attempted to collect usurious loan balances from Plaintiff and the Class members; and/or, (f) received payment on void and unenforceable loan balances from Plaintiff and the Class members.

249. The Defendants also each knew the ultimate goal of the enterprise – to make and collect loans charging well in excess of 25% APR.

**WHEREFORE**, Plaintiff and the putative class members pray for relief as follows:

a. Certification for this matter to proceed as a class action;

b. Treble all amounts paid by Plaintiff and the putative class members towards their Bright Lending Loans, pursuant to § 772.104, Fla. Stat.

c. Reasonable attorneys' fees and costs;

d. An order voiding any remaining Bright Lending loans made to Plaintiff and the Classes; and

e. Such other and further relief the Court may deem just and proper.

**COUNT V**
**VIOLATIONS OF THE FCCPA, § 559.72(9), FLA. STAT.**
**Florida Loan Class and TrueAccord FCCPA Class**

250. Mr. Loree adopts and incorporates paragraphs 1 – 208 as if fully restated herein.

251. The loans issued through Bright Lending to Mr. Loree and the Florida Loan Class were void, as the loans carried an interest rate more than double that of Florida's maximum statutory rate and were made without the required licensure under Florida's Consumer Finance Act, Chapter 516, Florida Statutes.

252. Defendants violated § 559.72(9), Fla. Stat., when they asserted the existence of legal rights which do not exist, specifically, the right to collect online payday loans which charged annual interest exceeding 600%, when such loans are null and void pursuant to Florida law.

253. Defendants, directly or via persons under their control and/or under the guise of Bright Lending, sent collection communications to Mr. Loree and the members of the Class at their homes in Florida in connection with the collection of the Loans.

254. Defendants, under the guise of Bright Lending, utilized bank wire transfers to credit, and then debit, Mr. Loree and other Class members' checking accounts they maintained in Florida, in connection with the collection of the alleged debts.

255. Defendants, under the guise of Bright Lending, acted with knowledge of the illegality of their actions in issuing a usurious loan to Mr. Loree and other members of the Class and pursuing collection of such loans in Florida, as these Defendants have been sued before for similar conduct and have designed their entire lending operation around evading state usury laws.

**WHEREFORE,** Plaintiff and the putative class members pray for relief as follows:

a. Certification for this matter to proceed as a class action;

b. Statutory damages of **$1,000.00**, paid to Plaintiff and the putative class members, pursuant to § 559.77(2), Fla. Stat.;

c. Actual damages paid to the Plaintiff and the putative class members, pursuant to § 559.77(2), Fla. Stat.;

d. An order voiding any remaining Bright Lending loans made to Plaintiff and the Classes;

e. Reasonable costs and attorneys' fees pursuant to § 559.77(2), Fla. Stat.; and,

f. Such other relief that this Court deems just and proper.

**COUNT VI**
**DECLARATORY AND INJUNCTIVE RELIEF**
**McCabe and the Florida Loan Class**
***Pled in the Alternative to Counts I-V***

256. Mr. Loree adopts and incorporates paragraphs 1 – 208 as if fully restated herein.

257. Mr. Loree pleads this Count strictly in the alternative should injunctive relief be unavailable under Counts I-V.

258. The Tribe, by and through one or more entities incorporated under tribal law, including IMDG, currently advertise and solicit consumers in Florida through direct mail, e-mail, text messaging, online advertising, its website, and its smartphone app, to take out loans with interest rates more than 38 times the legal limit in Florida.

259. Despite these loans, and any balance resulting therefrom, being void under Florida law, one or more entities incorporated under tribal law, or agents acting on behalf of one or more entities incorporated under tribal law, have routinely attempted to collect and do collect unlawful debts from Florida residents.

260. The Tribe's actions, by and through one or more entities incorporated under tribal law, violate Florida's strong public policy against usury.

261. No other adequate remedy at law exists.

262. As CEO of IMDG, McCabe has the authority to terminate any loan balance the Tribe, or any company operating under tribal law, claims is owed by Florida residents.

263. As CEO of IMDG, McCabe has the authority to terminate transaction activity deemed harmful and illegal by the State of Florida.

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court enter a declaratory judgment against the Tribe, providing:

a. A declaration that outstanding balances of Bright Lending loans made at more than 25% interest are null and void;

b. Injunctive relief prohibiting any further collection attempts;

c. Injunctive relief prohibiting any new loans from being made in Florida; and,

d. Any other relief this Court deems equitable and proper under the circumstances;

**COUNT VII**
**VIOLATIONS OF THE FDCPA, 15 U.S.C. § 1692e(2)(a)**
**TrueAccord FDCPA Class**

264. Mr. Loree adopts and incorporates paragraphs 1 – 208 as if fully restated herein.

265. TrueAccord violated **15 U.S.C. § 1692e(2)(a)** when it made false representations regarding the character or legal status of the Debt by falsely

representing to him that the Debt was enforceable despite it being unenforceable as usurious pursuant to Section 687.071(3), Florida Statutes.

266. TrueAccord's actions were willful and intentional and representative of its normal business practices.

**WHEREFORE,** Plaintiff and the putative class members pray for relief as follows:

a. Certification for this matter to proceed as a class action;

b. Statutory damages of **$1,000.00**, paid to Plaintiff and the putative class members, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

c. Actual damages paid to the Plaintiff and the putative class members, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

d. An award of pre-judgment and post-judgment interest as provided by law;

e. Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1692k(a)(3); and,

f. Such other relief that this Court deems just and proper;

**COUNT VIII**
**VIOLATIONS OF THE FDCPA, 15 U.S.C. § 1692e and 1692e(10)**
**TrueAccord FDCPA Class**

267. Mr. Loree adopts and incorporates paragraphs 1 – 208 as if fully restated herein.

268. TrueAccord violated **15 U.S.C. § 1692e and 1692e(10)** when it used false, deceptive, and misleading representations in connection with the collection of a debt by falsely representing that the Debt was legally enforceable when it was usurious and unenforceable pursuant to Section 687.071(3), Florida Statutes.

269. TrueAccord's actions were willful and intentional and representative of its normal business practices.

**WHEREFORE,** Plaintiff and the putative class members pray for relief as follows:

a. Certification for this matter to proceed as a class action;

b. Statutory damages of **$1,000.00**, paid to Plaintiff and the putative class members, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

c. Actual damages paid to the Plaintiff and the putative class members, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

d. An award of pre-judgment and post-judgment interest as provided by law;

e. Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1692k(a)(3); and,

f. Such other relief that this Court deems just and proper;

**COUNT IX**
**<u>VIOLATIONS OF THE FDCPA, 15 U.S.C. § 1692e(5)</u>**
**TrueAccord FDCPA Class**

270. Mr. Loree adopts and incorporates paragraphs 1 – 208 as if fully restated herein.

271. TrueAccord violated **15 U.S.C. § 1692e(5)** when it threatened action which could not legally be taken, to wit, that it would continue to attempt to collect the Debt from Mr. Loree, a Florida resident, when such action would be illegal under Florida law.

272. TrueAccord's actions were willful and intentional and representative of its normal business practices.

**WHEREFORE,** Plaintiff and the putative class members pray for relief as follows:

a. Certification for this matter to proceed as a class action;

b. Statutory damages of **$1,000.00**, paid to Plaintiff and the putative class members, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

c. Actual damages paid to the Plaintiff and the putative class members, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

d. An award of pre-judgment and post-judgment interest as provided by law;

e. Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1692k(a)(3); and,

f. Such other relief that this Court deems just and proper;

**COUNT X**
**VIOLATIONS OF THE FDCPA, 15 U.S.C. § 1692f(1)**
**TrueAccord FDCPA Class**

273. Mr. Loree adopts and incorporates paragraphs 1 – 208 as if fully restated herein.

274. TrueAccord violated **15 U.S.C. § 1692f(1)** when it attempted to collect an amount which included an illegally applied interest rate of 699.9752% per annum, when such fees are felonious under Florida criminal statutes. *See* Section 687.071(3), Florida Statutes.

275. TrueAccord's actions were willful and intentional and representative of its normal business practices.

**WHEREFORE,** Plaintiff and the putative class members pray for relief as follows:

a. Certification for this matter to proceed as a class action;

b. Statutory damages of **$1,000.00**, paid to Plaintiff and the putative class members, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

c. Actual damages paid to the Plaintiff and the putative class members, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

d. An award of pre-judgment and post-judgment interest as provided by law;

e. Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1692k(a)(3); and,

f. Such other relief that this Court deems just and proper;

## DEMAND FOR JURY TRIAL

Mr. Loree hereby demands a jury trial on all issues so triable.

Respectfully submitted on December 5, 2025, by:

**SERAPH LEGAL, P. A.**

*/s/ Brandon D. Morgan*
Brandon D. Morgan, Esq.
Florida Bar Number: 1015954
BMorgan@SeraphLegal.com
Thomas M. Bonan, Esq.
Florida Bar Number: 118103
TBonan@SeraphLegal.com
2124 W. Kennedy Blvd., Suite A.
Tampa, FL 33606
Tel: 813-567-3434
Fax: 855-500-0705
*Counsel for Plaintiff*

**ATTACHED EXHIBIT LIST**

A Mr. Loree's Loan Agreement with Bright Lending, December 7, 2020 – Excerpt
B Mr. Loree's Clarity Consumer Disclosure, October 1, 2025 – Excerpt
C Bright Lending Website - Excerpt
D Domain Registration for brightlending.com, Record Date: October 16, 2017
E Domain Registration for brightlending.com, Record Date: January 18, 2018
F Declaration of Benjamin E. Gatzke, October 3, 2025
G Domain Registration for greentrustcash.com, Record Date: September 13, 2015
H Declaration of Taylor McCabe, October 2, 2025